OAK CREEK VALLEY BANK OF VALPARAISO, APPELLANT, V. JESS HUDKINS, APPELLEE.

FILED JUNE 1, 1927. No. 24342.

Replevin: DAMAGES. "In replevin, damages for the detention of the property are recoverable only in case of a return. If the property is not returned the measure of damages is the value of the property as proved, together with lawful interest thereon from the date of the unlawful taking." *Romberg v. Hughes,* 18 Neb. 579.

APPEAL from the district court for Lancaster county: WILLARD E. STEWART, JUDGE. *Affirmed on condition.*

*Stewart, Perry, Stewart & Van Pelt,* for appellant.

*Fred C. Foster, O. K. Perrin* and *S. M. Kier, contra.*

Heard before GOSS, C. J., ROSE, DEAN, DAY, GOOD, THOMPSON and EBERLY, JJ.

DEAN, J.

This case was tried in Lancaster county to the court and a jury. The action involves a sheriff's sale, under an execution against certain exempt personal property which belonged to one of the defendants herein. The Oak Creek Valley Bank, plaintiff, hereinafter called the bank, became the owner of certain secured promissory notes by purchase. These instruments were made by Jess Hudkins, hereinafter called the defendant. The security consisted of cattle, horses, mules, swine, and certain farm implements and machinery. The jury found that certain of the property was exempt from sale and execution under the replevin writ from the fact that defendant was the head of a family; and in addition to the value of the exempt property, which the jury fixed at $575, the jury found that defendant suffered damage for its unlawful detention for a period of three months "in the sum of $375, making a total of $950." The jury, however, as against Jess Hudkins, aside from its finding in respect of the exempt property, found under the facts on the merits that the plaintiff bank "had a special interest in and is entitled to the immediate possession of the balance of the property in question." In its judgment the court affirmed the findings of the jur· throughout. Plaintiff appealed.

It may here be observed that Ray Hudkins, a son of Jess, was a party to the action by reason of an agister's lien for feed furnished by him and for the care of the live stock for a certain designated period. The jury found that he was entitled to $465 under his lien. After the trial

was over and before the appeal to this court was perfected·
the bank paid the agister's lien in full and by this pay-
ment the lien was discharged.  Hence, no further reference
will be made thereto nor to Ray Hudkins in this behalf.

Plaintiff's counsel, C. H. Slama, was present at the exe-
cution sale of the property and on the part of his client
testified that he bid $555 over and above the lien of the
bank under the direction of Jul. Petermichel, the bank's
vice-president and general manager, and that this direc-
tion was imparted to him by telephone from the bank in
response to his several telephone inquiries while the sale
was in progress.  Counsel's statement is corroborated by
the evidence of Petermichel on the cross-examination.  On
this point Petermichel's evidence follows:

"Q. You instructed him to bid $555 over and above the
mortgage?  A. Yes, sir.  Q. That is correct?  A. Yes, sir.
Q. And did you intend to discharge the mortgage, then,
Mr. Petermichel?  A. Not until we got hold of the prop-
erty.  Q. Well, if you had got hold of the property, did
you intend that that bid of $555 would be over and above
the mortgage that was owed against the property?  A.
Yes, sir; sure.  Q. You, then, would cancel the notes and
return them to Hudkins?  A. No; did not have to return
them to him; did not say anything about it.  Q. You would
have canceled them?  A. Canceled them and released the
mortgage in order to sell them to somebody else.  Q. That
would have been the end of the chattel mortgage on the
property?  A. Certainly."  Petermichel further testified:
"Q. And did you give Mr. Slama any instructions about
how to bid out there?  A. Yes; I told him to bid and see
that it did not go too cheap.  Q. Did you tell him how
much to bid?  A. No; I did not give him any specified
amount.  Q. Did you tell him what to start the bidding
at?  A. I told him to bid it in so that it did not go too
cheap, and then he called me up and, as I recollect it, two
or three times.  Q. During the sale?  A. During the sale.
*  *  *  Q. Did he tell you Ray Hudkins had bid $550
above the mortgages?  A. Yes, sir.  Q. Did you tell him

to raise that bid?  A. Told him to raise the bid."  In pursuance of the above instructions, plaintiff's counsel raised the bid $5, as above noted, and this was the final bid under the sale pursuant to the replevin writ.

The bank complains, *inter alia,* because the jury awarded $375 for the "use" value "as damages for four months detention of live stock" and some articles of machinery.  The argument is that this award is unreasonable, and that, solely under the facts here, if any award can be lawfully made for the unlawful detention of the property, aside from its proved value, it should be for the legal rate of interest on such value during the time of its detention, and no more.

A review of the record discloses that the value of the use of the personal property for which the defendant was awarded damages in the sum of $375 is based on evidence that was so speculative and mythical that its effect would be to confuse and mislead the jury.  On this point the defendant testified in respect of the supposed value of certain prospective litters of some of the sows, and was asked if he knew "whether or not they would have pigs."  He answered: "Oh, certainly."  This was followed by like evidence in response to an inquiry in respect of the "average number of pigs, * * * live pigs that would be had from a litter."  He answered that the number would be about five to fifteen, and that some might be lower and some higher than others.  And, in respect of the value of some of the sows, he testified that "if you go to some big hog man in the state to buy those thoroughbreds they would be awful high."  In respect of the value of the use of the horses, defendant testified that it would be "two dollars a day, I should think," and that for some of the machinery from the first of May until the date of the trial it "would be about a dollar a day, * * * something like that."

The incompetent evidence submitted by defendant, and apparently acted on by the jury, in respect of the "use" value of the property, was intensified by at least two in-

structions which were submitted by the court of its own motion. In one instruction the court informed the jury that "the value of said property at the time so taken, together with 7 per cent. interest from the date taken until the date of the trial, or the value of its use, if that exceeds the interest rate," would be the measure of damages for unlawful detention. In another instruction the jury were informed that, if they found that defendant was entitled to possession of the exempt property, their verdict should be for the return thereof, "or its value on the date replevined, together with interest thereon since said date, or in lieu of said interest the net usable value of said property less depreciation in the event it exceeds the interest."

In view of the evidence, as it relates both to unlawful detention and damages therefor, we think the court erred in that the instructions, on this feature of the case, were not confined solely to an allowance of interest on the value of the property at the lawful rate for the time that it was unlawfully detained. The court, however, in its instructions, evidently followed the rule announced in syllabus paragraph numbered 5 in *Schrandt v. Young*, 62 Neb. 254, wherein we said:

"Interest is the ordinary measure of damages of the defendant in replevin; but where the use. of the property has a value which exceeds the interest, he may recover such value, and his right so to do does not depend upon return of the property."

We take no exceptions to the above rule as announced in the Schrandt case, but we think it is not applicable to the facts in the present case. In the cited case, however, as disclosed by the concluding paragraph of the opinion, we held, as here, that all damages awarded defendant "for detention of the property in controversy in excess of lawful interest upon the value of his interest from the date of taking" be remitted, and that, failing therein, the action would be remanded for a new trial. The rule that has been

applied to like facts, as those presented here, has long prevailed in this jurisdiction.   In an early case we said:

"In replevin, damages for the detention of the property are recoverable only in case of a return.   If the property is not returned the measure of damages is the value of the property as proved, together with lawful interest thereon from the date of the unlawful taking." *Romberg v. Hughes,* 18 Neb. 579.

We conclude that the judgment of the district court, in so far as it awards damages for unlawful detention in excess of 7 per cent. per annum on $575 for the time that it was unlawfully detained, is erroneous.   Computed at 7 per cent. the amount of interest on $575 for wrongful detention amounts to $13.45.   The award of $375 is therefore excessive in the sum of $361.55.   If defendant, however, within 30 days will remit from the judgment the sum of $361.55, as of the date of the judgment in the district court, then such judgment will be affirmed; otherwise, the judgment will be reversed and the cause remanded.

AFFIRMED ON CONDITION.